Charles E. GIESSOW, Plaintiff-Appellant,

v.

Arthur LITZ et al., as members of the Civil Service Comm. of St. Louis County, Missouri, Defendants-Respondents.

No. 38050.

Missouri Court of Appeals,
St. Louis District,
Division Two.

Aug. 23, 1977.

Motion for Rehearing and/or Transfer
Denied Oct. 11, 1977.

Application to Transfer Denied
Nov. 14, 1977.

Hearnes, Padberg, McSweeney & Slater, St. Louis, for plaintiff-appellant.

Andrew J. Minardi, Assoc. County Counsel, Clayton, for defendants-respondents.

REINHARD, Judge.

Appellant, Charles E. Giessow, appeals from a judgment of the trial court which affirmed the findings of fact and conclusions of law determined by the Civil Service Commission of St. Louis County, Missouri. This decision held that the appellant had been properly discharged as Deputy Circuit Clerk of St. Louis County, Missouri.

On April 2, 1971, Giessow, a non-probationary employee, was given a personal action notice informing him of his dismissal. He was also given a letter dated that date signed by Frank P. Aschemeyer, Director of Judicial Administration, informing him that he was being dismissed on the grounds that: 1) he was incompetent in his performance of duties; 2) he was offensive in his conduct and language toward fellow employees, including supervisors; and 3) he failed to consistently maintain harmonious relationships with fellow employees, including supervisors.[1] Attached to the letter given Giessow on April 2, 1971, was a copy of a

1. These three grounds are among those included in Civil Service Commission Rule XVIII, Section 4, which provides:

"* * * The tenure of every permanent * * * employee shall depend upon the quality of his work standard and the rendering of efficient service, and any employee may be dismissed * * * for cause. The following are declared to be adequate causes for * * * dismissal:

* * * * * *

"(b) [The employee] is incompetent or inefficient in the performance of the duties of his position.

* * * * * *

memorandum dated March 30, 1971, from Raymond V. Clifford, Circuit Clerk, to Aschemeyer detailing specific complaints against Giessow. Also attached to the letter was a statement relating another incident involving Giessow. In addition to the memoranda attached to the April 2nd letter, on April 14, 1971, Giessow's attorney received at his request a supplement which contained further specifics. The letter, and its attachments of April 2, 1971, and the additional information supplied on April 14, 1971, constituted the formal notice in this case. Among the specifics alleged were: 1) that Giessow, in conversation with James McCullough, deputy sheriff, attempted to generate a complaint about the handling of garnishment matters to the clerk's office when there was no complaint; 2) that Giessow constantly badgered and insulted Agnes Bishop, and also disrupted her work and threatened her job; 3) that he showed Agnes Bishop filthy pictures and told her dirty stories; 4) that he made statements to McCullough that he would fire three clerks if he had his way; 5) that he pitted employee against employee, specifically Mrs. Bishop against Miss Lott; 6) that he was constantly harassing Mrs. Price and misrepresented to her what Mr. Clifford said about excuses for Saturday work; 7) that he asked Miss Lott to spy on Mr. Pauli so that he could create trouble for him, and that he had a "bad apple" list of those who had caused him trouble; 8) that he asked Mrs. Bishop to lose the files of three circuit judges; and 9) that he used profane language towards employees.

The Civil Service Commission of St. Louis County began a hearing on August 23, 1971, at which time the County presented its evidence. The hearing was recessed until September 21, 1971, at which time appellant presented his evidence.

In January, 1971, three County employees, Milton Young, Supervisor of Accounting, Agnes Bishop, a writs clerk, and Roscoe Summers, made complaints against Giessow. Young threatened to resign because of Giessow's continuous interference with Young's employees. Bishop complained of mental anguish brought on by Giessow's remarks, insinuations and disrupting orders. Summers complained of Giessow's treatment of Bishop and of Giessow's interference with Summers' subordinates.

Giessow was warned of these complaints in January, 1971. He was told by his supervisor, Clifford, that no merit increase would be forthcoming until he made significant improvement in the areas of employee punishment, personal business on County time, getting along with other supervisors, and his attitude toward employees. In February, 1971, after repeated complaints from Summers and James Martin, another supervisor, about Giessow's disrupting their operations, Clifford reduced Giessow's responsibilities. Giessow was told that until he improved his actions in the areas previously discussed he was to be on the same managerial level with Martin and Summers, rather than on a higher supervisory level as he had been previously.

In March, 1971, Clifford received complaints from several other employees. Their complaints included instances of unfair treatment by Giessow, allegedly prompted by Giessow's own personal likes and dislikes among the employees. One employee, Catherine Lott, complained that Giessow kept a "bad apple list" of those he did not like. Lott said that after she refused to spy on Pauli, Giessow told her he had a "bad apple list". Agnes Bishop again complained of harassment by Giessow, including verbal abuse, interrupting business phone conversations, and placing "dirty pictures" on her desk. Martin and Summers also reported that Giessow had ignored the restructuring and was continuing to give orders to employees not under his control.

"(e) has been offensive in his conduct or language toward his fellow employees, his supervisors or the public.

"(f) has not consistently maintained harmonious relationships with fellow employees or his supervisors."

Martin reported late night phone calls from Giessow who would tell him "what a lousy so & so I was and if it had not been for him I would have been fired . . . ."

On March 26, 1971, James McCullough, a deputy sheriff, spoke to Giessow about locating a garnishment file and asked Giessow: "Isn't there some way in which we could get garnishments a little quicker?" Giessow responded by blaming the delay on Summers because he would not fire several clerks in the office. Giessow then went to Clifford with McCullough's complaint, despite the fact that McCullough did not want to make a complaint to Clifford and had asked Giessow not to pursue it.

At the Commission's hearing, most of those who made complaints reported in Giessow's notice gave further details about the bases of their complaints regarding Giessow's course of conduct. Mrs. Bishop testified that Giessow ordered her to lose several files in order to discredit certain judges; that sometime after her refusal Giessow forced her to sit with her desk facing the wall because "he said it made him feel good to know that I was uncomfortable and unhappy"; that Giessow threatened continually to have her fired; that Giessow told her "filthy" jokes, and when she asked him not to, she was told: "If I appreciated my job, I would look and listen"; and that Giessow caused trouble among employees by telling each stories about the other.

Agnes Bishop also testified that Giessow told her: "Get your a__ over to that phone." She also related an incident when Giessow exhibited to her a match book which, when opened, revealed an obscene picture. When Mrs. Bishop told him she did not appreciate things of that nature, Giessow replied, " * * * you appreciate your job don't you—then look at what I show you." Mrs. Bishop also testified that on several occasions Giessow would break into her business phone calls and tell the party at the other end that Mrs. Bishop did not know what she was talking about.

At the hearing, Mrs. Price testified that Giessow overworked her on weekends and misrepresented Clifford's instructions in justifying the overload. She further related an incident when Giessow told her over the phone to "get your a__ [to work]." She also repeated her complaints that Giessow spoke disparagingly about her fellow employees in an attempt to alienate one employee from the other.

Mr. Martin testified that he heard Giessow use profane language toward several employees although he did not remember specific instances. At the hearing, Miss Lott repeated her allegation concerning Giessow's request that she spy on Pauli and stated that he threatened to put her on his "bad apple list". McCullough told the Commission about Giessow's attempt to generate a complaint about the handling of garnishment files. Giessow denied all of the allegations against him.

It was the testimony of Lott, Price, Bishop, McCullough and Martin upon which the Commission based its findings of fact and conclusions of law. The Commission found sufficient evidence to uphold Giessow's dismissal on the grounds that he had been offensive in his language and conduct toward his fellow employees and his supervisors [Civil Service Comm. Rule XVIII, Sec. 4(e)], and that he had not consistently maintained harmonious relationships with fellow employees including supervisors [Civil Service Comm. Rule XVIII, Sec. 4(f)].

Appellant's first point on appeal is that the grounds cited for Giessow's dismissal are not equivalent to "legal cause" and therefore violate the St. Louis County Charter. Appellant argues that the Charter authorizes a merit system to be established "for the retention of said employees and officers on the basis of merit and ability", Art. VII, § 2010 "New St. Louis County Charter, 1968", and that the grounds for Giessow's dismissal do not conform to this mandate. Appellant argues that since the Commission did not find him to be incompetent, as originally charged, it is inconsistent

to find that he lacked the merit or ability as required by the Charter.

Appellant further argues that merit system employees can only be dismissed for "legal cause", citing *McCallister v. Priest*, 422 S.W.2d 650 (Mo. banc 1968), and that subsections (e) and (f) of Civil Service Comm. Rule XVIII do not comply with the definition of "legal cause" set out in the case. In *McCallister* the court said:

> " 'The cause must be one which specially relates to and affects the administration of the office, and must be restricted to something of a substantial nature directly affecting the rights * * * of the public.' " 422 S.W.2d at 657.

Appellant's contentions take a very narrow view of merit, ability, and activity by government employees which affect the public. Justice Powell, concurring in *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), wrote:

> "In the present case, the *Government's interest,* and *hence the public's interest,* is the maintenance of employee efficiency and discipline. Such factors are essential if the Government is to perform its responsibilities effectively and economically. * * * Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the workplace, foster disharmony, and ultimately impair the efficiency of an office or agency." (Emphasis added.) 416 U.S. at 168, 94 S.Ct. at 1651.

■ The Rule under which appellant was dismissed provides that the tenure of a permanent employee "shall depend upon the quality of his work standard and *the rendering of efficient service* ", and any employee may be dismissed for cause. Rule XVIII, § 4. The evidence showed that

Giessow's conduct interfered with others performing their tasks. Instances of disruption include Giessow's continuous interference with the employees of other supervisors, promotion of mistrust between fellow employees, and requests that an employee lose files of judges. Also included were Giessow's comments to an outsider that if he had his way he would fire three employees.

■ There is no question that when an employee's actions disrupt the efficient operation of a governmental office the public is directly affected in a substantial way. The appellant would have us hold that so long as a public employee successfully performs his job, his job is secure regardless of how his actions interfere with his fellow employees' abilities to complete their jobs. Such an argument is untenable.

■ The Commission specifically found as a matter of fact and law that "Giessow was a disruptive and divisive force in the Circuit Clerk's office." Where a public employee's course of conduct is so offensive or his relationship with fellow employees so disharmonious as to have such an effect, the government clearly has legal cause to dismiss him.

■ Appellant's second point on appeal is that subsections (e) and (f) of Civil Service Comm. Rule XVIII, Sec. 4, are invalid and unenforceable because they are vague and overbroad [2] in violation of the State and Federal constitutions, and further are so indefinite and uncertain as to render them void. Appellant contends that the words "offensive" and "harmonious" are vague because "men of common intelligence must necessarily guess at its meaning and differ as to its application, * * *." *Connally v. General Const. Co.*, 269 U.S. 385, 391, 46

---

**2.** Although appellant claims subsections (e) and (f) are overbroad in his points relied on, Rule 84.04(d), nothing in his argument on the points, including his cases cited, speak to the question of overbreadth. Rule 84.04(c). Where the point of error is not developed in the

argument portion of the brief, it is not properly presented for review. *Bopp v. Spainhower*, 519 S.W.2d 281 (Mo. banc 1975). We therefore will only consider appellant's allegations of vagueness and indefiniteness.

S.Ct. 126, 127, 70 L.Ed. 322 (1926). Appellant further argues that subsections (e) and (f) of Civil Service Comm. Rule XVIII, Sec. 4, are so vague that he had no notice of what activities contravened these subsections.

Vagueness is a matter of degree. It must be recognized that "there are limitations in the English language with respect to being both specific and manageably brief", *United States Civil Service Commission v. National Association of Letter Carriers, AFL–CIO,* 413 U.S. 548, 578–9, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973), and that "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972). The "root of the vagueness doctrine is a rough idea of fairness." *Colten v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972).

■■■ Considering these general limitations of language, the fact that the terms "offensive conduct or language" and "harmonious relationships" are not references to specific acts does not make them vague *per se.* Courts have recognized the necessity of broad range regulations and "catchall" phrases, particularly in situations where the regulation is applied to a large population undertaking disparate tasks from which a diversity of situations may arise. *Arnett v. Kennedy, supra; Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). More specifically, a standard is not vague if the code is set out in terms which an ordinary person exercising common sense can sufficiently understand and comply with without sacrifice to the public interest. *United States Civil Service Commission v.*

*National Association of Letter Carriers, AFL–CIO, supra.* Nor can an employee complain of vagueness where his conduct is simply inconsistent with proper working behavior. *Carter v. United States,* 132 U.S. App.D.C. 303, 311, 407 F.2d 1238, 1246 (1968).

Civil Service Commission Rules were promulgated by the Commission to regulate the personnel of a large county government where innumerable situations do arise. Administrative convenience demands sufficient leeway to accommodate the standards here involved; were it otherwise, the legislature, or the Commission, would be faced with an impossible task of specifying each type of prohibited action. The length of such a list would itself be prohibitive. Furthermore, the challenged behavior need not always be a single act of misconduct which would by itself warrant dismissal; the improper behavior may involve a course of conduct occurring over a period of months or years. The employing agency must be able to discharge an employee for a course of repugnant conduct when one act would not be sufficient.

■ The rules relating to standards of conduct challenged by Giessow are not void for vagueness and fairly apprised him of the type of conduct which might serve as a basis for discharge.[3] They do not attempt to detail the specific acts which may be grounds for discharge but rather lay down a reasonable framework within which the individual may regulate his conduct. The terms here, "offensive conduct" and "harmonious relationships", are such that a utilization of common sense will give the employee sufficient understanding to enable him to comply with the rules without loss to the public interest.[4]

---

**3.** These standards are clearly as specific as others which have been upheld as not being invalid per se. *Milani v. Miller,* 515 S.W.2d 412 (Mo.1974) (conduct unbecoming); *McCallister v. Priest, supra* (general inefficiency, if specific allegations are made); *Arnett v. Kennedy, supra* (promote the efficiency of the service).

**4.** While we do not find the rules to be vague, we also uphold their application in this case on the basis of the prior warnings given Giessow about his unacceptable behavior. In other cases wherein regulations were claimed to be vague, the courts have upheld dismissal where specific warnings were given. The courts have said that prior specific warnings remove the

Appellant next contends that the notice given him was vague, indefinite, uncertain and overbroad, and that it was in violation of the due process guarantees of the Missouri and United States Constitutions because it failed to inform him of the charges against him. He also asserts that the notice was illegal because it violated St. Louis County Ordinance § 202.180(13) which provides:

"For discharge . . . only after the person to be discharged has been presented with the reasons for such discharge . . ., specifically stated in writing."

■ Appellant argues that the additional memoranda supplied on April 2 and April 14 are not part of his formal notice. This contention is without merit. See *Friedman v. Miller,* 525 S.W.2d 770 (Mo.App.1975), where we held that supplemental memoranda given a discharged employee will be considered as part of the notice.

The notice contained in the memoranda of April 2 and April 14 satisfied both the constitutional requirements of due process and the specificity requirements of the County ordinance. The purpose of the notice is to inform an employee of the nature of the charges so that he can adequately prepare his defense. *Holley v. Personnel Advisory Bd.,* 536 S.W.2d 830, 832[2] (Mo. App.1976); *Reynolds v. United States,* 454 F.2d 1368, 197 Ct.Cl. 199 (1972). See also, *Valter v. Orchard Farm School Dist.,* 541 S.W.2d 550, 557 (Mo.1976). The items included in the notice of April 2 and April 14, listed above in the discussion of the facts, were specific enough, under the general charges that he had been offensive in his language and conduct toward his fellow employees and supervisors, and that he had not consistently maintained harmonious relationships with them, to inform him of the allegations against him.

■ It was a course of conduct and extensive pattern of behavior for which Giessow was dismissed and the notice clearly informed him of the charges against him. Although Giessow complained of the vagueness of the charges, he clearly understood them and at great length endeavored to rebut them. Charges in a notice of dismissal need not meet the specificity of a criminal indictment. *Lowery v. Richardson,* 390 F.Supp. 356 (E.D.Okl.1973); *Benjamin v. Commonwealth, State Civil Service Commission,* 17 Pa.Cmwlth. 427, 332 A.2d 585 (1975). In reviewing the findings of the Commission, some of the specific charges on which the Commission based its findings of fact were based upon testimony of that part of the hearing held on August 23, 1971, but were not included in Giessow's formal notice.[5] Commission reliance on these charges does not violate or offend constitutional due process because of the nature of the hearing. The hearing was held in two steps, the appellant presenting his evidence on September 22, 1971. In *National Labor Relations Board v. Remington Rand, Inc.,* 94 F.2d 862, 873[31] (2nd Cir. 1938), a bill of particulars to the employer was requested and improperly denied in a hearing before the National Labor Relations Board. In the opinion, Judge Learned Hand stated:

" * * * a bill is important only when a party must meet his adversary's case without opportunity to prepare; it is of

issue of ambiguity in the application of the regulation. *Meehan v. Macy,* 129 U.S.App.D.C. 217, 392 F.2d 822 (1968); *Faust v. Police Civil Service Commission of State College,* 22 Pa. Cmwlth. 123, 347 A.2d 765 (1975).

**5.** In reviewing the Commission findings, we found three charges for which Giessow was given no formal notice: 1) Mildred Price complained that Giessow started treating her unfavorably after she turned over dirty pictures which she found in the office mail to a supervisor other than Giessow; 2) Giessow allegedly accused Agnes Bishop of committing perjury in a divorce trial at which she testified; and 3) Giessow harassed Bishop by continuously changing the phones she was permitted to use.

slight value in a trial by hearings at intervals."[6]

■ The appellant was not prejudiced because of the late notice. His attorney undertook lengthy cross-examination of the County's witnesses and recalled some of them. Any specific charges not specified in the formal notice were consistent with and generally repetitive of those related in the formal notice he received in April, 1971, and they all supported the charge of a pattern of conduct described in the notice. He was not denied due process because he had not received notice of the allegations upon which the Commission based its findings.

Although the delayed notice does not violate constitutional due process, charges presented for the first time at the hearing are contrary to the procedure required by the County ordinance and Commission rule. While we must disregard the Commission's findings on these delayed charges, reversal of the Commission's conclusions does not necessarily follow.

■ The reviewing court need not sustain the Commission on each and every one of the subsidiary findings of fact. *National Labor Relations Bd. v. Reed & Prince Mfg. Co.,* 205 F.2d 131 (1st Cir. 1953). *Holley v. Personnel Advisory Bd., supra.*

We find that the Commission's decision was amply supported by valid findings.

■ Appellant's next point is that he was denied a fair hearing because the Commission allowed substantial hearsay and conclusional testimony. Appellant claims that the testimony given by Mr. Clifford and Mr. Aschemeyer relating the complaints made to them by various employees was hearsay and not admissible. The purpose of the testimony of Clifford and Aschemeyer was to show the reasons they decided to discharge Giessow. Their testi-

mony was not intended to prove the truth of the substance of the conversations. Testimony of a witness regarding the statement of another is hearsay only when the statement is offered as proof of the matters stated therein. *Still v. Travelers Indemnity Company,* 374 S.W.2d 95, 102[6] (Mo.1963). Appellant also objects to the admission into evidence of other hearsay testimony and conclusional statements.

■ Although the evidence objected to by appellant may be hearsay or conclusional, and, as such, would not be admissible in a court of law, the technical rules of evidence do not control in an administrative hearing. Reception of hearsay or other inadmissible evidence does not dictate a reversal unless there is not sufficient competent evidence to sustain the decision. *McCallister v. Priest, supra* at 659[14]. See also, *Crawford v. Industrial Commission,* 482 S.W.2d 739 (Mo.App.1972); *Pope v. St. Louis Public Service Company,* 341 S.W.2d 123 (Mo.1960).

■ The record, consisting of 1004 pages, discloses that the Commission did admit hearsay and conclusional testimony, but it shows that the findings of fact and conclusions of law were based on competent evidence. The testimony heard by the Commission included numerous specific instances which provided sufficient evidence to support the grounds for Giessow's dismissal. Although Giessow denied such allegations against him, the credibility of all witnesses is within the discretion of the administrative body. *Schrewe v. Sanders,* 498 S.W.2d 775 (Mo.1973). Our review of the Commission's decision is limited to whether the decision is clearly contrary to the overwhelming weight of the evidence. *Friedman v. Miller, supra* at 772. The substantial weight of competent evidence supports the Commission's decision.

---

6. Also see, on delayed notice, *Montana Power Co. v. Federal Power Commission,* 87 U.S.App. D.C. 316, 185 F.2d 491 (1950); *Locomotive Finished Mat. Co. v. National Lab. Rel. Board,* 142 F.2d 802 (10th Cir. 1944); 1 Davis, Administrative Law Treatise §§ 8.04–.05 (1958); *Kuhn v. Civil Aeronautics Board,* 87 U.S.App.D.C. 130, 183 F.2d 839 (1950); *Cella v. United States,* 208 F.2d 783 (7th Cir. 1953).

Appellant's next point is that the Commission's findings are invalid because it relied on matters outside the record. He bases this contention on one of the conclusions of law of the Commission as follows: "The record shows that prior to the hearing Mr. Giessow had availed himself of discovery by taking the depositions of numerous witnesses who included the Circuit Clerk and Director of Judicial Administration." Giessow argues that this indicates the Commission read these depositions, gave consideration to them, and based its decision upon them. This contention is pure speculation and is not supported by the record. The Commissioners who testified at the circuit court hearing stated that they did not consider the substance of any matter not on the record. In addition, nothing in the Commission's findings of fact indicated that the Commission relied on any information except that which appears in the record.

Only one modification is required in the order of the Commission and the decision of the lower court. Although appellant was dismissed on April 2, 1971, the final statutory notice given him was on April 14, 1971. County Ordinance § 202.180(13) requires that the employee be given both notice and a ten-day reply period *prior* to dismissal.[7] We thereby hold that in accordance with the requirements of that ordinance, the day of discharge of the appellant should have been April 24, 1971. The County is ordered to pay the appellant his back pay until that date, including interest.

The decision of the Commission was not arbitrary or capricious and its decision and that of the lower court is affirmed, with provisions for the payment of back salary as set out above.

McMILLIAN, P. J., and STEWART, J., concur.

7. The date originally set for Giessow's dismissal, April 2, 1971, complied with the requirements of Commission Rule XVIII § 6. That rule allows notice to be given within one week after the effective date of dismissal and gives the employee ten days after receipt to reply. This rule, however, is in conflict with County Ordinance § 202.180(13) which authorizes the promulgation of the Commission rule on discharge. The ordinance requires the date of discharge be set at the end of the ten-day period following the employee's receipt of the notice of discharge.